| | | |
|---|---|---|
| GLORIA J. THOMPSON | : | IN THE UNITED STATES DISTRICT COURT |
| Plaintiff | : | FOR THE MIDDLE DISTRICT OF |
| | : | PENNSYLVANIA |
| V. | : | |
| | : | DOCKET NO.:_____ |
| KEYSTONE HUMAN SERVICES: | | |
| CORPORATION | : | JURY TRIAL DEMANDED |
| Defendant | : | |

## COMPLAINT OF DISCRIMINATION IN EMPLOYMENT

This action for injunctive relief and damages is brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000*e et seq*., and the Age Discrimination in Employment Act as amended, 29 U.S.C. Sec 621 *et seq* (ADEA) to remedy discrimination on the basis of race, sex and age in the terms, conditions and privileges of employment.

## JURISDICTION

This Honorable Court has jurisdiction of this matter under 42 U.S. C. § 2000e-5(f), under 28 U.S.C. §§ 1331 and 1343(4); and 29 U.S.C. Sect 621 *et seq.*

## VENUE

(1) Plaintiff is Mrs. Gloria J. Thompson, a female citizen of the United States born in 1962 and is a resident of Dauphin County, Pennsylvania.

(2) Defendant is Keystone Human Services Corporation, a Pennsylvania Corporation doing business in the Commonwealth of Pennsylvania, is a corporation engaged in "commerce," and is subject to the jurisdiction of this Court. Defendant is an employer within the meaning of 42 U.S.C. § 2000e-(b) and employs more than five hundred (500) employees. 42 U.S.C. 1977(A)(b)(3)

## FACTS

(3) Paragraphs 1 and 2 are incorporated herein by reference as if fully set forth herein.

(4) On July 27, 1998, the Defendant hired Plaintiff as a Rehabilitation Specialist.

(5) On or about September 2002, the Plaintiff was transferred with Defendant's organization to the position of Personal Care Associate.

(6) On July 8, 2003, Plaintiff was very ill and called off sick in accordance with Defendant's policy and was racially harassed by Tracy Robinson, Assistant Supervisor, by requiring that Plaintiff come in to work or find coverage which was not the standard practice or protocol of Defendant and was not how Defendant treated non-minority employees.

(7) On June 8, 2003, Defendant's Assistant Supervisor, Tracy Robinson, ignored Plaintiff's ill condition and threatened to fire her if she did not come in to work or find coverage which was not how Defendant treated non-minority employees.

(8) Defendant's Director, Matt McGeorge, contacted Plaintiff on June 8, 2003, called Plaintiff and told her that, despite her illness, he supported Assistant Supervisor Tracy Robinson, claimed that she followed proper procedure and confirmed that Defendant had no written procedure in effect to substantiate her actions.

(9) Defendant did not treat non-minority employees who called off sick the same way.

(10) On July 5, 2004, Plaintiff became extremely ill while working at Defendant's facility and called the pager in accordance with established practice and procedure.

(11) Defendant's pager was not working properly when Plaintiff called and she was forced to call another number to obtain immediate support for Plaintiff's illness.

(12) Plaintiff was able to contact Amy Hurst, Assistant Supervisor, by telephone while Plaintiff was in the midst of violently heaving and throwing up and requested that she obtain medical help for her and coverage to ensure the safety of the residents over which she was responsible.

(13) Assistant Supervisor, Amy Hurst, told Plaintiff that she could not leave until Plaintiff had called some of the other employees to get a replacement.  Defendant did not treat other non-minority employees who became suddenly ill in this fashion, nor was this requirement part of Defendant's written practices or procedures and was inhumane.

(14) Plaintiff  begged Assistant Supervisor, Amy Hurst, for help due to her intense illness but Ms.  Hurst refused, failed to help and instead harassed Plaintiff by insisting on giving Plaintiff  telephone numbers to call to obtain coverage at the facility for residents before Plaintiff would be able to leave to attend to her intense illness.
It is believed and therefore averred that Caucasian, non-minority and male employees similarly situated were not treated this way and there was no written policy established by the Defendant that Ms, Hurst was following.

(15) Plaintiff complied with Ms. Hurst's requirement for her to find coverage before she could leave when she was able to reach co-worker Jennifer (last name unknown) who said that she was not the on-call person and could not come because she was watching a baby and shortly thereafter Plaintiff lapsed into semi-consciousness.

(16) Amy Hurst called back and Plaintiff's condition was significantly worse.  Plaintiff told her that she could not call any more numbers and begged her to call Matt McGeorge, Director, as she was losing consciousness.

(17) Plaintiff's husband came to Defendant's facility, saw his wife in a semi-conscious state and immediately called an ambulance.

(18) Because no member of Defendant's management staff came to this facility which housed approximately ten (10 ) disabled adult mental health residents, Plaintiff's husband stayed at the facility to ensure the safety of the disabled residents and looked for a telephone number for someone in authority to call and he eventually found a number for Director Matt McGeorge, called and advised him of what happened and waited for a long time until Matt arrived before he could leave to attend his gravely ill wife.

(19) On or about September 1, 2004, Plaintiff filed a complaint against Defendant with the Commonwealth of Pennsylvania Board of Health for their treatment of her on July 5, 2004 and informed Defendant's Human Relations Department about how Defendant had discriminated against her and harassed her.

(20) Plaintiff learned that Defendant was cited by the Commonwealth of Pennsylvania during an investigation for having her husband (a non-employee) soley on the premises and responsible for the residents while he waited for Defendant's management personnel to come after Plaintiff was taken away in the ambulance and for not insuring that Plaintiff was timely re-certified in CPR while she was employed by Defendant who had customarily done that with Plaintiff and other employees.

(21) Defendant, since it's inception, knew of its requirement to have all employees working with residents currently certified in CPR before they could work with residents and failed to ensure that Plaintiff timely received her training but ensured that Caucasian and other non-minority employees were currently certified each year and then harassed

      Plaintiff by blaming her for not being currently certified in CPR, claiming that it was solely her responsibility to ensure current CPR certification and threatened Plaintiff with adverse disciplinary action.

(22) Defendant not only failed to discipline the employee(s) involved in the discriminatory conduct of July 5, 2004, Defendant failed to initiate training for the involved employees and supervisors on how to properly handle sudden employee illness situations like hers and failed to change supervisory responsibilities as requested by Plaintiff.

(23) In response to an investigation by the Commonwealth of Pennsylvania which was initiated by Plaintiff's complaint, Defendant simply added a "Hotline" where complaints could be made.

(24) On November 20, 2004, Defendant's employee Megan (last name currently unknown), race Caucasian, publicly cursed Plaintiff out while they were working and in front of residents and staff which was in direct violation of Defendant's established policy.

(25) Plaintiff reported the incident to Matt McGeorge, Director, and Dottie Sirea, Human Resources Director, and Mr. McGeorge refused to hear her complaint of discrimination.

(26) On December 12, 2004, Plaintiff followed the chain of command and reported the incident to Mike Grier, Human Resources Vice President, and no disciplinary or corrective action was taken against this Caucasian employee which was required by Defendant's own policy.

(27) Defendant violated it's own policy by taking no disciplinary action against Megan (last name unknown) by Defendant.

(28) Defendant created and/or fostered a hostile environment which permitted and, by inaction, acquiesced to discriminatory, harassing and disrespectful behavior and speech toward Plaintiff within it's workforce and not properly addressing it in accordance with EEO principles.

(29) Respondent's management employees and supervisors would have known that Plaintiff opposed the discriminatory treatment and harassing behavior which she suffered because she raised complaints during the normal course of their work.

(30) One management employee, Laura Kuchta , who had worked for Defendant for approximately two months suggested that Defendant leave her position with Defendant; something that was not done with Caucasian and/or non minority employees.

(31) Defendant engaged in a pattern of harassing and discriminatory behavior that made the workplace a hostile environment for Plaintiff.

(32) During approximately 10 years of employment with Defendant, Plaintiff received numerous accolades, awards, and commendations for the care she provided to residents and for her dedication to Defendant's mission.

(33) On or about July 2005, Plaintiff's elderly mother became very ill, needed Plaintiff's care, and Plaintiff requested Family Medical Leave in accordance with Defendant's existing written policy and was told by Pam Berkins, Supervisor, that she did not have any leave time available to take and refused to allow Plaintiff to take any leave time in spite of the fact that Plaintiff's paystub reflected ample available leave time.

(34) Plaintiff informed Supervisor Berkins that other employees (Caucasians and non-minorities) were not treated in such a harassing and discriminatory way.

(35) Defendant's management team consisting of Supervisor Berkins and Director McGeorge later met with Plaintiff and advised her incorrectly that the only leave that was available to her was two weeks of annual leave and if she failed to return in two weeks Defendant would not hold her position. Caucasian and non-minority employees were not threatened with termination for needing to use leave time that they earned and which was reflected on their paystub.

(36) Defendant consistently ignored the fact that Plaintiff's paystubs reflected substantially more leave time available to her than what they claimed. Other Caucasian and non-minority employees were not treated this way and were allowed to use their published available leave time.

(37) Defendant's management personnel consisting of Wendy Grace, Human Resources, and Dottie Sirea, Director, supported Director McGeorge's requirement that she take annual leave due to Defendant's position which blatantly ignored Plaintiff's paystub which reflected an ample amount of leave available for her to use.

(38) Defendant's refusal to allow Plaintiff to use her available leave time was a violation of the Family and Medical Leave Act.

(39) Plaintiff refused to put in for the two weeks of annual leave which Defendant was requiring and worked for a few days during the following week.

(40) While Plaintiff was working, Defendant's Human Resources representative, Wendy Grace, told Plaintiff that they had made a 'mistake' and that she had many weeks of leave available for Family Medical Leave.

(41) Defendant, while verbally acknowledging the 'mistake' they made, failed to correct Plaintiff's leave balance and allow her to properly use it and harassed Plaintiff for requesting it.

(42) It is believed and therefore averred that 'mistakes' made by Defendant with Caucasian and other non-minority employees were rare and promptly corrected while Defendant's 'mistake' with Plaintiff was not corrected and was permitted to continue to negatively affect Plaintiff in violation of Defendant's own policy and in violation of Defendant's duty of fair dealing.

(43) On or about December 19, 2005, Defendant's Supervisor, Wendy Grace, advised Plaintiff that she would be paid the week before Christmas.

(44) Defendant did not pay Plaintiff as Supervisor Grace had represented but paid other Caucasian and non-minority employees and advised Plaintiff that it was a 'mistake' that she had noted in a letter that she had sent to Plaintiff.

(45) It is believed and therefore averred that Defendant's harassing and discriminatory behavior was in retaliation for Plaintiff's filing of her complaint with their Human Resources Department on or about September 1, 2004.

(46) During October 11, 12, and 13, 2006, the Commonwealth of Pennsylvania inspected the Defendant's facility and informed them that employees files had to be updated within 7 days and Plaintiff's certification in CPR was about to run out on October 22, 2006.

(47) Defendant failed, refused, neglected or intentionally did not tell Plaintiff that she needed to be certified as of October 22, 2009 and provide her with the opportunities to timely take CPR training with them in order to continue to work there and had her continue

working at the facility after her certification ran out. Caucasian and non-minority employees were not treated this way.

(48) On November 27, 2006, Plaintiff was working at Defendant's facility when she was called into a meeting near the end of her shift at approximately 6:30 a.m. when Bobbi Olson, Program Director, and Laura Kuchta, Program Administrator came in and demanded that she stay for an unannounced meeting when she was not feeling well.

(49) Defendant's management personnel demanded that Plaintiff come to the basement for their meeting and Plaintiff advised them that she was feeling worse.

(50) During the meeting Defendant's personnel gave her three written warnings that were not not factually correct, Plaintiff began to feel even worse and began to stand up while both Olson and Kuchta began yelling at her.

(51) Olson and Kuchta began yelling at her to leave and Plaintiff lost consciousness.

(52) Defendant's personnel did absolutely nothing to help Plaintiff and failed to call for emergency assistance. Defendant did not treat Caucasian, non-minority or male employees this way.

(53) Plaintiff remained unconscious and unattended on Defendant's facility floor for an extended period of time until Plaintiff's husband came to the facility and was told by Defendant's employees that Plaintiff was in the basement and directed to go around to the side of the house where he found Plaintiff still unconscious and lying on the floor.

(54) Plaintiff was rescued by her husband and taken to the hospital from Defendant's facility by her family. and her husband remained at the facility until he was able to reach a staff member to 'cover' Plaintiff's shift to ensure that the residents were safe and not left

unattended due to Plaintiff's hospitalization when she was the sole staff person on duty responsible for the residents.

(55) In late November 2006, Plaintiff complained to Director Sirea about their discriminating behavior of leaving her unattended and unconscious on the floor to no avail.

(56) From on or about December 1, 2004 to through July 8, 2008, Defendant's supervisors, Laura Kuchta, Mike Flack and Pam Berkins engaged in a pattern of behavior where each time Plaintiff was off of work due to sickness she was required to bring in a doctor's excuse which was not required of Caucasian or non-minority employees.

(57) Plaintiff's attendance and employment record with Defendant did not warrant such discriminatory and harassing behavior.

(58) Plaintiff suffered work related injuries while working for Defendant and required surgery which would require excused time off from work during 2008.

(59) Plaintiff informed Defendant of the required surgery.

(60) Defendant placed Plaintiff on involuntary medical leave under the Family Medical Leave Act on May 8, 2008 which effectively required Plaintiff to use up her leave time and put her in a posture for termination in accordance with Defendant's policy.

(61) On June 27, 2008, Defendant's supervisor Wendy Grace notified Plaintiff that if she failed to make timely payments by the first (1st) and fifteenth (15th) of each month her benefits of health, life and disability insurance coverage would be withdrawn. Other Caucasian and non-minority employees were not treated this way.

(62) On June 30, 2008, to harass Plaintiff, Defendant's supervisor, Wendy Grace, mailed a letter to Plaintiff with the 'requirement' for her to keep existing coverage that she had to make the payment by the next day, July 1, 2008.

(63) Once Plaintiff complained to Defendant about harassing and discriminatory behavior, Defendant retaliated against Plaintiff by requiring her to provide doctor's excuses for all absences while Caucasian and other non-minority employees were not required to do the same.

(64) Co-workers who did not complain or oppose discrimination were not subject to the same harassing and discriminatory behavior by Defendant as Plaintiff was.

(65) Plaintiff was effectively terminated from Defendant's employ without notice and her position was filled by a younger Caucasian with less experience than she.

(66) As a result of Defendant's treatment of Plaintiff, Plaintiff suffered a loss of income, status and fringe benefits.

(67) As a result of the Defendant's acts of discrimination and harassment, Plaintiff suffered emotional harm and harm to her reputation.

(68) Defendant's acts of discrimination were performed with malice and reckless indifference to Plaintiff's protected civil rights.

(69) The foregoing action of Defendant against Plaintiff because of her sex/race/age is in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2

(70) Plaintiff filed a timely charge of sex/race discrimination with the Pennsylvania Human Relations Commission which was dual filed with the Equal Employment Opportunity Commission and brings this action within ninety (90) days of the receipt of her Notice of Right to Sue.

**PENDENT STATE CLAIMS**

(71) Paragraphs 1 – 70 are incorporated herein by reference as if fully set forth herein.

(72) This Court's pendent jurisdiction is invoked over a claim arising under the Pennsylvania Human Relations Act, Exec Law Sec (296(1)(a) which prohibits discrimination in employment on account of physical disability.

(73) Plaintiff suffered a fall while working a Defendant's facility which required her to undergo surgery and Plaintiff was unable to work for approximately three (3) months.

(74) Plaintiff received a physician's clearance to return to work with a fifteen (15) weight lifting weight restriction and Defendant would not permit Plaintiff to return to her position.

(75) Defendant refused to make reasonable accommodation for Plaintiff's disability and refused to allow her to return to work.

(76) Plaintiff's position prior to her injury(ies) did not contain a lifting requirement for her to properly and adequately perform her duties.

(77) Upon Plaintiff's return to work, she suffered a disability within the meaning of that term as used in Exec Law Sec 292(21). She was not prevented from performing in a reasonable manner the activities of her job with the Defendant.

WHEREFORE, Plaintiff respectfully prays this Court:

(a) To award her under Title VII all pay, promotions and fringe benefits she has lost as a result of Defendant's unlawful discrimination against her;

(b) To award her, Under Title VII, compensatory and punitive damages in an amount commensurate with the applicable statutory maximums.

(c) To award her under 42 U.S.C. § 2000e-5(k) reasonable attorney's fees and costs of this action;

(d) Declare that the acts and practices complained of herein are in violation of Title VII and the Pennsylvania Human Relations Laws;

(e) Enjoin and permanently restrain these violations of Title VII and the Pennsylvania Human Relations Laws by the Defendant;

(f) Direct Defendant to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect Plaintiff's employment opportunities;

(g) Direct Defendant to make her whole for all earnings she would have received but for Defendant's discriminatory treatment, including but not limited to, wages, pension, health insurance, promotions and other lost benefits;

(h) Direct Defendant to pay Plaintiff an additional amount as liquidated damages as provided for in Section 7(b) of the ADEA, 29 U.S.C. Sec 626(b) and other applicable statutes; and

(i) Granting such other and further relief as this Honorable Court deems necessary, just and proper.

Respectfully submitted,

_____
Doreena L. Sloan, Esquire
PA Supreme Court ID #44880
1849 State Street
Harrisburg, PA 17103
(717) 232-0577
(717) 232-3991 (fax)
Sloanlaw1@aol.com
Attorney for Plaintiff

## VERIFICATION

I, Gloria J. Thompson, Plaintiff herein, hereby verify that the information contained in the foregoing Complaint is true and correct to the best of my knowledge, information and belief. I understand that false statements herein are made subject to the penalties of 18 Pa.C.S.A. – unsworn falsification to authorities.

Date: //December 24, 2009                             //Gloria J. Thompson
                                                      Gloria J. Thompson